Hopkins v. MWR Mgmt. Co., 2017 NCBC 46.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

BRANDON HOPKINS,

        Plaintiff,

v.

MWR MANAGEMENT COMPANY
d/b/a MICHAEL WALTRIP RACING
and TY NORRIS,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 697

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1.    **THIS MATTER** is before the Court upon (i) Plaintiff Brandon Hopkins's ("Plaintiff" or "Hopkins") Motion for Summary Judgment ("Plaintiff's Motion") and (ii) Defendants MWR Management Company d/b/a Michael Waltrip Racing ("MWR" or "Michael Waltrip Racing") and Ty Norris's ("Norris," collectively, "Defendants") Motion for Summary Judgment ("Defendants' Motion," collectively, the "Motions") in the above-captioned case. Having considered the Motions, the briefs and evidence in support of and in opposition to the Motions, and the arguments of counsel at a hearing on the Motions, the Court herein **GRANTS in part** and **DENIES in part** the Motions.

> *Van Kampen Law, PC, by Joshua R. Van Kampen, Sean F. Herrmann, and Kevin P. Murphy, for Plaintiff Brandon Hopkins.*
>
> *James, McElroy & Diehl, P.A., by Jon P. Carroll and Adam L. Ross, for Defendants MWR Management Company and Ty Norris.*

Bledsoe, Judge.

## I.

## PROCEDURAL BACKGROUND

2. This action arises out of the termination of Brandon Hopkins's employment as a pit crew member for one of the race teams operated by Defendant Michael Waltrip Racing.

3. Plaintiff initiated this action on January 12, 2015 and filed an amended complaint on May 26, 2015. On November 5, 2015, the Court dismissed some of Plaintiff's claims and also granted Plaintiff leave to amend the complaint a second time to assert certain new claims. *Hopkins v. MWR Mgmt. Co.*, 2015 NCBC LEXIS 104 (N.C. Super. Ct. Nov. 5, 2015).

4. Plaintiff filed the Second Amended Complaint on November 10, 2015, asserting three claims against both MWR and Norris for (1) defamation, (2) tortious interference with contract, and, alternatively, (3) tortious interference with prospective economic advantage, and four additional claims solely against MWR for (1) wrongful discharge in violation of public policy, (2) violation of the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240 *et seq.*, (3) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, and (4) violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*

5. The Court subsequently granted in part and denied in part Defendants' partial motion to dismiss the Second Amended Complaint, dismissing only Plaintiff's ADA claim to the extent that claim was based on Plaintiff's alleged actual disability

in the major life activity of sleeping. *Hopkins v. MWR Mgmt. Co.*, 2016 NCBC LEXIS 40 (N.C. Super. Ct. May 13, 2016).

6. Defendants assert counterclaims against Plaintiff for (1) breach of contract, (2) conversion, (3) misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 *et seq.*, (4) unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1, (5) trespass to chattels, and (6) punitive damages.

7. On September 1, 2016, Plaintiff and Defendants filed their respective Motions for Summary Judgment. Each party seeks summary judgment on all of the claims asserted by the opposing party. The Court held a hearing on the Motions on November 3, 2016, at which all parties were represented by counsel. The Motions are now ripe for resolution.

II.

FACTUAL BACKGROUND

8. The Court does not make findings of fact on motions for summary judgment. Instead, the Court summarizes the facts before it, noting undisputed and contested facts, to provide context for the claims and its ruling on the Motions. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975).

A. Hopkins's Employment with MWR

9.     MWR previously owned and operated two race teams—the #15 team and the #55 team—that competed in NASCAR's Sprint Cup Series. MWR ceased operations in December 2015.

10.     MWR first hired Hopkins to join its pit crew in November 2011 as a tire changer pursuant to a one-year contract. The first one-year contract was followed by a similar one-year agreement in 2012. Hopkins became the front tire changer on MWR's #15 car, and in September 2013, he and MWR executed a two-year contract for Hopkins to continue working through the 2015 race season. (Defs.' Mot. Summ. J. Ex. 3, hereinafter "Employment Agreement.")

11.     The Employment Agreement contained a confidentiality agreement and a covenant not to compete. (Employment Agreement ¶¶ 7–8.) The non-compete provision provided that "in the event this Agreement is terminated for any reason other than . . . by the Company without cause," Hopkins would not accept a paying position with another NASCAR Nationwide Series or Sprint Cup Series team for up to one year. (Employment Agreement ¶ 8.) Hopkins received a copy of MWR's employee manual ("Employee Manual") in conjunction with his execution of the Employment Agreement. (Countercl. ¶ 24; Reply ¶ 24.)

12.     NASCAR tire changers use "pit guns" to change tires during races. In late 2013, MWR began developing a proprietary line of "clutch guns"—a type of pit gun—to keep up with other teams who were also using the emerging clutch gun technology. (Watson Dep. 68:4–9; 83:13–20). MWR assigned Hopkins to work closely with Brian

Watson, MWR's in-house engineer, on the clutch gun program; Hopkins helped test the clutch guns, provided MWR's engineer with feedback after races, and disassembled and serviced the clutch guns. (Watson Dep. 83:21–84:6; 85:4–9.) MWR placed great trust in Hopkins to securely transport the clutch guns to and from races. (Norris 237:13–23.)

13. MWR considered its clutch gun program to be confidential and proprietary. MWR limited access to the "shock room" where the clutch guns were stored and serviced, (Watson Dep. 37:2–4), and it required its employees to sign confidentiality and non-disclosure agreements prior to permitting access to the clutch guns, (Myers Dep. 324:2–8). Prior to Hopkins's termination, MWR allowed its pit crew members to use MWR clutch guns when moonlighting in other NASCAR series races, although it required those pit crew members to get permission before doing so. (Watson Dep. 91:10–22.) Hopkins argues, however, that MWR was lax in enforcing these rules. (Miller Dep. 139:1–12.)

B. Hopkins's Injury

14. Hopkins injured his shoulder in October 2013 after being struck by the #15 car during a race. (Defs.' Br. Supp. Mot. Summ. J. 5.) MWR did not dispute the cause of Hopkins's injury prior to the filing of this action, although MWR now contends that discovery has shown that Hopkins sustained his injury outside of work. (Defs.' Br. Supp. Mot. Summ. J. 5 n.3.) Hopkins worked with Pamela Brown, MWR's in-house athletic trainer, to treat his shoulder, but the injury worsened, and MWR opened a worker's compensation claim for Hopkins on January 30, 2014. (Defs.' Mot. Summ.

J. Ex. 10.) In March 2014, Hopkins underwent an MRI, which revealed that he had a torn labrum. Hopkins's doctors advised that he needed surgery to repair the injury. Hopkins and Brown scheduled his surgery to occur some seven months later, after the last race of the season in November 2014. (Hopkins Dep. 328:11–15.)[1] Hopkins argues that MWR pressured him into delaying surgery until the season was over, whereas MWR contends that Hopkins wanted to complete the season before repairing his shoulder.

15. Despite his injury, Hopkins continued working as a pit crew member at races. After a particularly painful race, however, Hopkins reported to MWR that he could no longer tolerate his injury and on July 30, 2014, demanded that his surgery be rescheduled to occur as soon as possible. (Hopkins Dep. 344:10–25.) Brown promptly rescheduled Hopkins's surgery to occur less than two weeks later on August 7, 2014. (Hopkins Dep. 353:2–6.)

16. The parties expected Hopkins's shoulder to need twelve weeks of recovery time after surgery before he could resume his pit crew duties. (Hopkins Dep. 409:25–410:7.) Hopkins discussed a plan with his supervisors to be out of work for twelve days of worker's compensation leave, after which he would return to full-time office work while his shoulder healed. (Hopkins Dep. 410:17–24; Smith Dep. 247:14–248:14.)[2] The parties expected that Hopkins would be able to resume training with

---

[1] Hopkins repeatedly refers to the "Homestead Race" as the last race of the season. The Court takes judicial notice of the fact that in 2014, the Sprint Cup Series championship race in Homestead, Florida at the Homestead Miami Speedway occurred on November 16, 2014. *See* N.C. R. Evid. 201.

[2] Walt Smith was MWR's pit crew coach. (Countercl. ¶ 90; Reply ¶ 90.)

his teammates approximately six weeks after surgery. (Hopkins Dep. 412:10–11.) The plan called for Dave Collins to serve as Hopkins's replacement until Hopkins was medically cleared to return to work, with the possibility that he would be back for the last three races of the 2014 season. (Smith Dep. 249:7–11; Hopkins Dep. 410:1–7.)

C. Hopkins discusses his contract with Norris and takes home the 035 Gun

17.     On Monday, August 4, 2014, three days before Hopkins's scheduled surgery, Hopkins met with Norris in Norris's office to discuss Hopkins's future at MWR. All parties agree that this conversation occurred, although they dispute what exactly was said. Hopkins states that he had heard from pit crew members on other teams that MWR intended to replace Hopkins as the front tire changer on the #15 car. (Hopkins Dep. 579:5–12.) This particularly troubled Hopkins because his contract extended through the following year's race season. (Hopkins Dep. 583:8–11; Employment Agreement ¶ 2.) Hopkins asked Norris about these rumors, and received assurances from Norris that his job was safe. (Hopkins Dep. 584:21–23.)

18.     Norris agrees that he and Hopkins discussed Hopkins's "contract situation" in the August 4 meeting because Hopkins was "worried about his job when he came back [from surgery]." (Norris Dep. 350:19–25.) Norris also agrees that he attempted to assure Hopkins that MWR was not seeking to replace Hopkins. (Norris Dep. 355:1–8.) Norris, however, states that Hopkins also asked him for permission to "talk to other teams," which Norris understood as a request that Hopkins be released from his non-compete. (Norris Dep. 351:1–24.) Hopkins denies that he asked for

permission to speak with other teams, (Hopkins Dep. 584:3–7), and denies that he discussed his non-compete with Norris, (Hopkins Dep. 585:9–13).

19.     It is undisputed that when Hopkins left work later that day, he took home with him the clutch gun numbered 035 (the "035 Gun"). At the time in question, MWR numbered each of its guns and assigned a primary and a backup clutch gun to each tire changer. (Defs.' Mem. Supp. Mot. Summ. J. 5.)

20.     Hopkins contends that on August 4, 2014 he mistakenly grabbed the 035 Gun and some clutch gun sockets as he rushed to leave work, thinking that he was grabbing his own personal "hammer gun," which was stored in a similar bag. (Hopkins Dep. 533:10–16.) Hopkins admits that taking home a pit gun like the 035 Gun is a violation of MWR company policy, but contends that MWR did not strictly enforce that policy. (Hopkins Dep. 675:1–6.) Hopkins testified that he intended to return the 035 Gun the next morning but was running late and left the gun sitting on the kitchen counter at his house. (Hopkins Dep. 677:4–23.)

21.     Shannon Myers, the tire changing coach for the #15 car and a member of the #15 car's pit crew, (Countercl. ¶ 60), realized the 035 Gun was missing on the morning of August 5, (Countercl. ¶ 101). Defendants argue and present evidence that during MWR's investigation into the 035 Gun's whereabouts, Hopkins was dishonest and not fully forthcoming. Myers asserts that when he approached Hopkins to ask about the 035 Gun, Hopkins stated that he thought he had put the gun in the pit box, which was en route to a race site and thus inaccessible. (Myers Dep. 234:22–235:10). After Myers spoke with Hopkins, MWR began reviewing surveillance footage of the

engineering department to locate the missing gun. (Asberry Aff. ¶ 9.) Don Asberry, MWR's IT Manager, testified that the footage appears to show that Hopkins removed a pit gun, placed it in a nondescript bag, and carried it to his car. (Asberry Aff. ¶ 9.)

22.     Hopkins contends that around 11:00 on the morning of August 5, he realized both that he had left the 035 Gun at home and that he had misunderstood Myers's earlier questioning. Consequently, he approached Watson to tell him that he had the 035 Gun at his house. (Hopkins Dep. 690:8–691:23; Pl.'s Resp. Opp. Defs.' Mot. Summ. J. Ex. 1.) In order to get a clear idea of what happened, Norris called a meeting with Hopkins and a number of other MWR coaches, HR individuals, and managers for later that day. (Myers Dep. 264:19–25.) Norris stated that he perceived Hopkins's answers to questions in that meeting as "very inconsistent" and "stumbling." (Norris Dep. 387:16–17.) Norris further testified that ultimately he and the other decision-makers believed that Hopkins was being untruthful and had breached MWR's trust. (Norris Dep. 405:22–406:1.) MWR sent another employee home with Hopkins to collect the 035 Gun and sockets. (Hopkins Dep. 701:8–13.) MWR notified Hopkins that he was terminated the next morning, on August 6, 2014. (Norris Dep. 408:24–25.)

D. Hopkins develops a relationship with Chip Ganassi Racing

23.     Hopkins had surgery as scheduled on August 7, 2014, and his doctor cleared him to return to work with no restriction on October 28, 2014. (SAC ¶ 42.) Shortly thereafter, Hopkins began spending time at the facilities of Chip Ganassi Racing ("CGR") as part of its "developmental pit crew." Hopkins describes this as an unpaid

internship, (SAC ¶ 45), with the expectation that it could lead to a job offer, (Hopkins Dep. 84:24–85:4). CGR's pit coach, Shaun Peet, also helped Hopkins secure individual engagements pitting for another team, Turner Motorsports, in Truck Series races. (Hopkins Dep. 88:9–20.)

24. After learning that Hopkins was spending time at CGR, Norris instructed one of MWR's employees to notify CGR of Hopkins's non-compete agreement with MWR. (Pl.'s Resp. Opp. Defs.' Mot. Summ. J. Ex. 27.) CGR did not cut off ties with Hopkins, and Norris eventually approached Steve Lauletta, CGR's president, and Peet. (Norris Dep. 533:13–20.) On separate occasions, Norris told Lauletta and Peet that Hopkins could not be present at CGR, that Hopkins had been terminated for cause over "IP protection," (Norris Dep. 536:23–537:1), and that MWR had video footage of Hopkins removing a pit gun from its facilities, (Peet Dep. 82:1–4). After Norris discussed Hopkins with these individuals, CGR cut its ties with Hopkins, and Peet stopped helping Hopkins secure jobs for Truck Series races. (Peet Dep. 105:3–106:21.)

E. The Confidential Documents and the 040 Gun

25. Several of MWR's claims are also based on the alleged theft of confidential documents and the 040 Gun.

26. MWR's surveillance footage shows that Hopkins picked up a stack of papers from a printer in the pit coach's office on August 4, 2014 after leaving Norris's office. (Asberry Aff. ¶ 9.) Asberry, MWR's IT manager, has cataloged eight confidential and proprietary documents (the "Confidential Documents") that he alleges were accessed

and printed in the minutes before Hopkins took the papers from the printer. (Asberry Aff. ¶ 11.)

27. Hopkins acknowledges only that he printed blank gun reports for other pit crew members to fill out and emailed to himself a "breakdown sheet" that MWR regularly distributed to the pit crew members after each race. (Hopkins Dep. 622:16–23; 624:12–14.) Shortly after MWR fired Hopkins, Norris wrote in an e-mail to other MWR officials:

> The issue of confidential documents is not relevant to [Hopkins's] Termination. The facts are that several documents were opened on his computer . . . immediately after leaving my office. Video surveillance clearly shows him grabbing a stack of papers off of the printer located in Walt Smith's office. However, according to Don Asberry, there is not an electronic footprint which shows those documents were printed since the printer in the coach's office does not record history.

(Pl.'s Mot. Summ. J. Ex. 4.)

28. Hopkins's backup gun was number 040 (the "040 Gun"). Several months before Hopkins was terminated, MWR's 040 Gun went missing. (Countercl. ¶ 67.) MWR now contends that Hopkins misappropriated that gun as well. (Countercl. ¶ 73.) No investigation was conducted at the time the 040 Gun could not be located, and Norris acknowledges that the circumstances surrounding its disappearance remain a mystery. (Norris Dep. 429:2–6.) The 040 Gun has not been located. After the 040 Gun disappeared, Hopkins contends that he and Watson, MWR's in-house engineer, agreed that Hopkins would use the 035 Gun as his backup. (Hopkins Dep. 398:15–25; Watson Dep. 156:2–4.)

III.

LEGAL STANDARD

29.    Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c).  Supporting evidence must "set forth such facts as would be admissible in evidence," N.C. R. Civ. P. 56 (e), and materials containing hearsay matters or otherwise inadmissible materials should not be considered on a motion for summary judgment, *Strickland v. Doe*, 156 N.C. App. 292, 295, 577 S.E.2d 124, 128 (2003).

30.    "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002) (citing *DeWitt v. Eveready Battery Co.*, 355 N.C.672, 681, 565 S.E.2d 140, 146 (2002)).  An issue is genuine if it is "supported by substantial evidence," and "an issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action." *DeWitt*, 355 N.C. at 681, 565 S.E.2d at 146.  "[O]nce the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000).  All

of the "[e]vidence presented by the parties is viewed in the light most favorable to the non-movant." *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003).

## IV.

## ANALYSIS

### A. Defendants' Motion for Summary Judgment

31.     Hopkins alleges that MWR terminated him because of his shoulder injury in violation of the Americans with Disabilities Act, the Family Medical Leave Act, North Carolina's Retaliatory Employment Discrimination Act, and the common law of wrongful discharge.  The Court first addresses Hopkins's statutory claims.

### a. Plaintiff's discrimination and retaliation claims under *McDonnell Douglas* burden-shifting

32.     A plaintiff can succeed on a claim brought under the ADA either by offering sufficient direct and indirect evidence or by relying on circumstantial evidence under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015).  This same standard has been applied to retaliation claims under the FMLA, *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013), and to state retaliatory discharge claims under REDA, *Fatta v. M & M Props. Mgmt.*, 221 N.C. App. 369, 371, 727 S.E.2d 595, 598 (2012) (quoting *Lilly v. Mastec N. Am., Inc.*, 302 F. Supp. 2d 471, 481 (M.D.N.C. 2004) (evaluating a REDA claim using the *McDonnell Douglas* burden-shifting scheme)).

33.     "To survive summary judgment on the basis of direct and indirect evidence, [the plaintiff] must produce evidence that clearly indicates a discriminatory attitude

at the workplace and must illustrate a nexus between that negative attitude and the employment action." *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999). Hopkins has not produced direct or indirect evidence of discrimination and retaliation, so his claims must be evaluated under the *McDonnell Douglas* burden-shifting framework.

34. Under the *McDonnell Douglas* framework, a plaintiff carries the initial burden of establishing a *prima facie* case of wrongful or retaliatory termination. *Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 523–24 (W.D.N.C. 2015).

> If a plaintiff presents sufficient evidence to satisfy the underlying *prima facie* elements of each of his claims, then the burden of production "shifts" to the employer to offer a legitimate, nondiscriminatory explanation for its decision to terminate. . . . "If the defendant meets this burden of production, the presumption created by the *prima facie* case 'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that [he] has been the victim of intentional discrimination [or retaliation]."

*Id.* at 524–25 (quoting *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995)). Plaintiff's final burden is sometimes described as a burden "to show that the [employer's] proffered reason is pretext." *Jacobs*, 780 F.3d at 578.

### i. *Prima Facie* Case – ADA discrimination

35. The ADA prohibits covered entities from discriminating against a "qualified individual on the basis of disability," 42 U.S.C. § 12112(a), and from retaliating against employees who seek protection under the ADA, 42 U.S.C. § 12203(a), (b). Claims of discrimination and retaliation under the ADA are distinct. Hopkins alleges that MWR violated the ADA "by treating [him] differently than his peers in the terms and conditions of employment and ultimately terminating him on the basis of his

actual or perceived disability," (SAC ¶ 93), and by "retaliating against Plaintiff for exercising his statutory right to request a reasonable accommodation under [the ADA]," (SAC ¶ 94).

36.     To establish a claim for discriminatory termination under the ADA, Hopkins must prove "(1) that [he] has a disability, (2) that [he] is a 'qualified individual' for the employment in question, and (3) that [his] employer discharged [him] . . . because of [his] disability." *Jacobs,* 780 F.3d at 572 (quoting *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)).  Defendants' Motion does not argue that Hopkins has failed to show that he was a qualified individual with a disability.[3]  Instead, Defendants contend that Hopkins has failed to demonstrate that MWR discharged him because of his disability.  (Defs.' Mem. Supp. Mot. Summ. J. 19.)

37.     The plaintiff's burden in proving a *prima facie* case under the ADA is "not onerous, [but] it is also not empty or perfunctory.  Plaintiff's evidence must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law." *Ennis*, 53 F.3d at 59 (citing *Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)); *see also Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (stating the plaintiff's burden in establishing a *prima facie* case is *de minimis*).

38.     Based on the record here, the Court concludes that Hopkins has presented sufficient evidence to establish his *prima facie* case.  Hopkins contends that the close

---

[3] The Court previously determined that, at least for the purposes of Rule 12(b)(6), Hopkins has alleged that he was a qualified individual with a disability under the ADA.  *Hopkins*, 2016 NCBC LEXIS 40, at *23–24.

temporal proximity between his request for surgery, the surgery itself, and his termination is enough evidence for a jury to reasonably conclude that MWR terminated him because of his disability. Defendants disagree and point out that Hopkins alleges that his injury occurred in October 2013, a full ten months before he was terminated.

39. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Merrill v. McCarthy*, 184 F. Supp. 3d 221, 243 (E.D.N.C. 2016) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Requesting a reasonable accommodation is a "protected activity" under the ADA, 42 U.S.C. 12112(b)(5), and medical leave can be a reasonable accommodation, particularly where "it is finite and will be reasonably likely to enable the employee to return to work," *Kitchen v. Summers Continuous Care Ctr., LLC*, 552 F. Supp. 2d 589, 596 (S.D.W. Va. 2008). Here, Hopkins was fired only one week after informing his employer that he needed his shoulder surgery rescheduled as soon as possible and could not, as previously planned, complete the season. (SAC ¶ 25.) This is, in essence, a new request for a reasonable accommodation of earlier-than-planned medical leave. His termination occurred one day before his surgery.

40. Although MWR knew of Hopkins's injury months before they fired him, a jury could find a causal connection between his disability and his termination based on the date on which he requested that his surgery occur as soon as possible. In

analyzing an ADA discrimination claim, the Fourth Circuit has described a time period of three weeks between requesting an ADA accommodation and termination as "weigh[ing] heavily in favor of finding a genuine dispute as to causation" such that summary judgment for the employer is inappropriate. *Jacobs*, 780 F.3d at 575 (reversing district court's grant of summary judgment for the employer). In reaching that conclusion, the court cites an earlier Fourth Circuit decision for the rule that temporal proximity alone can be sufficient to establish a *prima facie* case. *Id.* (citing *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001)).

41. Here, the quick turnaround between Hopkins informing MWR that he could not complete the season due to his injury, his re-scheduled surgery, and his termination, meets the burden for showing causation, and thus Hopkins has stated a *prima facie* claim for ADA discrimination. *See Jacobs*, 780 F.3d at 575; *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 875–6 (8th Cir. 2008) (finding sufficient evidence of temporal proximity in a discrimination claim where "only a few days elapsed" between the employee's notification of his intent to have surgery and the employer's decision to terminate him).

42. As an additional basis for dismissal, Defendants argue that the ADA claim must fail, in part, because Hopkins failed to include in his EEOC Charge his specific averment that MWR "treat[ed] [him] differently than his peers in the terms and conditions of his employment," (SAC ¶ 93). (Defs.' Br. Supp. Mot. Summ. J. 25.) Where an ADA plaintiff's claims exceed the scope of the plaintiff's EEOC charge, such claims are procedurally barred on the grounds of failure to exhaust administrative

remedies. *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995). In determining the scope of an EEOC charge, "the court's analysis is based on those claims stated in the charge and those reasonably related to or developing from a reasonable investigation of the stated claims." *Spainhour v. Lowe's Cos.*, 5:16-CV-00138-RLV-DSC, 2017 U.S. Dist. LEXIS 55933, at *13 (W.D.N.C. Apr. 12, 2017).

43. In this case, the factual allegations in the EEOC Charge are substantially similar to those alleged in the Second Amended Complaint, and the Charge clearly forecast all possible claims under the ADA—discrimination, retaliation, and failure to accommodate: "the Company terminated me due to an actual or perceived disability and/or in retaliation for my exercising my right to have a reasonable accommodation. . . . The Company also violated the ADA by failing to reasonably accommodate me." (Defs.' Mot. Summ. J. Ex. 14.) The Court concludes that Hopkins's allegation of different treatment from his peers is the sort of factual contention "that would naturally have arisen from an investigation of [the EEOC Charge]," *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995), and thus may be advanced in this litigation.

ii. *Prima Facie* Case – Retaliation under the ADA and REDA

44. As stated above, the ADA prohibits employers from retaliating against employees who seek the protection of the ADA. REDA provides similar protection under state law, barring employers from "discriminat[ing] or tak[ing] any retaliatory action against an employee because the employee in good faith does or threatens to" file a worker's compensation claim. N.C. Gen. Stat. § 95-241(a)(1)(a).

45. Hopkins alleges that MWR violated these statutes by retaliating against him for filing a worker's compensation claim and for seeking a reasonable accommodation of shoulder surgery and leave. (SAC ¶¶ 86, 94.)

46. In order to establish a *prima facie* claim for retaliation under the ADA, Hopkins must show "(1) that [he] engaged in protected conduct, (2) that [he] suffered an adverse action, and (3) that a causal link exists between the protected conduct and the adverse action." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011) (citing *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001)) (stating the *prima facie* elements for ADA retaliation). A *prima facie* case under REDA requires a plaintiff to show "(1) that he exercised his rights as listed under N.C. Gen. Stat. § 95-241(a) [the Worker's Compensation Act], (2) that he suffered an adverse employment action, and (3) that the alleged retaliatory action was taken because the employee exercised his rights under N.C. Gen. Stat. § 95-241(a)." *Fatta*, 221 N.C. App. at 371, 727 S.E.2d at 598–99 (quoting *Wiley v. UPS, Inc.*, 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004)).

47. Here, again, Defendants do not dispute that Hopkins engaged in protected conduct under the REDA or the ADA by filing a worker's compensation claim or seeking surgery. Nor do Defendants dispute that Hopkins suffered an adverse employment action; he was terminated. As before, Defendants challenge Hopkins's ability to meet the causal requirement in his *prima facie* case.

48. As with an ADA discrimination claim, a plaintiff alleging retaliation under the ADA and REDA can satisfy the causation element of the *prima facie* case by

"present[ing] evidence of close temporal proximity between the protected activity and the adverse employment action, or a pattern of conduct." *Fatta*, 221 N.C. App. at 372–73, 727 S.E.2d at 599 (2012) (quoting *Smith v. Computer Task Group, Inc.*, 568 F. Supp. 2d 603, 614 (M.D.N.C. 2008) (evaluating a REDA claim)). Temporal proximity alone can be enough to satisfy the *prima facie* causality requirement for a retaliation claim under both the ADA and REDA. *Id.* (applying the rule in the REDA context)*; Jacobs*, 780 F.3d at 579 (applying the rule in the ADA context)). Defendants argue that the ten-month period between Hopkins's injury and his termination date, and the six-month period between the filing of Hopkins's worker's compensation claim and his termination date, falls well outside the two-and-a-half month period that Defendants argue is the outer limit for temporal proximity in such cases. *See Nguyen v. Austin Quality Foods, Inc.*, 974 F. Supp. 2d 879, 891 (E.D.N.C. July 26, 2013) (collecting cases).

49. With regard to the ADA retaliation claim, the Court has already concluded that Hopkins has presented sufficient evidence of the close temporal proximity between his protected activity—requesting an early surgery date—and his termination to satisfy the *prima facie* burden for his discrimination claim. The same analysis holds for Hopkins's retaliation claim as well. As discussed above, the Fourth Circuit in *Jacobs* concluded that a three-week period between engaging in protected conduct and an employee's termination was sufficient to satisfy the *prima facie* causation element of an ADA discrimination claim. 780 F.3d at 575. The Fourth Circuit determined that this time period was equally probative for the plaintiff's ADA

retaliation claim, holding that "[t]his close temporal proximity [of three weeks] is sufficient to establish a disputed issue of fact as to the causation element of the prima facie case," precluding dismissal for failure to make out a *prima facie* case. *Id.* at 579; *see also King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding a ten-week period between engaging in protected activity and termination sufficient to establish causation in plaintiff's *prima facie* retaliatory discharge claim).

50. Similarly, the Court concludes that the date of Hopkins's request for a new surgery date is relevant for a temporal proximity analysis under REDA. The current version of the REDA statute "covers all aspects of a workers' compensation proceeding," *Lilly*, 302 F. Supp. 2d at 481, including "[f]il[ing] a claim or complaint, initiat[ing] any inquiry, investigation, proceeding or other action, or testify[ing] or provid[ing] information to any person with respect to" the worker's compensation act, N.C. Gen. Stat. § 95-241(a)(1).

51. When confronted with the same argument advanced by Defendants here, the North Carolina federal court in *Lilly* determined that negotiating a settlement fell within the protection of REDA and that the plaintiff had therefore presented evidence of close temporal proximity when he was terminated one day after settling his worker's compensation claim with his employer's insurer. *Lilly*, 302 F. Supp. 2d at 481–82. The Court agrees that REDA "covers all aspects of a workers' compensation proceeding" because, when the General Assembly adopted the broad language of section 95-241(a)(1), it repealed the prior version of the statute, which only prohibited retaliation against employees for instituting worker's compensation

claims or testifying in proceedings. *See* 1991 N.C. Sess. Laws 1021 (enacting N.C. Gen. Stat. § 95-241(a)(1) and repealing N.C. Gen. Stat. § 97-6.1).

52. In this case, Hopkins invoked the protection of REDA when he filed his worker's compensation claim in January 2014. He was terminated seven days after informing MWR that he could not complete the season because he needed surgery as soon as possible. Under the broad scope of REDA, Hopkins's request for a new surgery date qualifies as protected activity. Thus, the seven days between Hopkins's request and his termination is sufficient to establish close temporal proximity to sustain his *prima facie* case of retaliation under REDA. *See Webb v. K.R. Drenth Trucking, Inc.*, 780 F. Supp. 2d 409, 413 (W.D.N.C. 2011) (finding close temporal proximity under REDA where "[defendant] terminated [plaintiff] less than two days after [defendant's manager] discussed treatment by [defendant's] doctor with [plaintiff]").

### iii. *Prima Facie* Case – FMLA retaliation

53. The FMLA allows eligible employees to take "a total of 12 workweeks of leave during any 12-month period" for "a serious health condition that makes the employee unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). Employers may not "interfere with, restrain, or deny the exercise of" an employee's FMLA rights, 29 U.S.C. § 2615(a)(1), nor may employers "discharge or in any other manner discriminate against" employees asserting FMLA rights, 29 U.S.C. § 2615(a)(2). Claims brought under 2615(a)(1) are known as FMLA interference claims, and claims brought under 2615(a)(2) are known as FMLA retaliation claims.

54. Hopkins brings both FMLA interference and retaliation claims against MWR by alleging that "MWR repeatedly discouraged [him] from taking his requested FMLA protected leave and ultimately terminated him for these requests." (SAC ¶ 100.) Hopkins's FMLA retaliation claim can be evaluated under *McDonnell Douglas* burden-shifting, but the interference claim is subject to a different standard of proof, which the Court addresses separately. *See, e.g.*, *Anderson v. Discovery Communs.*, 517 Fed. Appx. 190, 197–98 (4th Cir. 2013) (evaluating FMLA retaliation and interference claims under distinct evidentiary frameworks).

55. A *prima facie* case for FMLA retaliation requires the same elements as a *prima facie* case for ADA retaliation. *See Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (listing the elements for a *prima facie* case of FMLA retaliation). Unlike with Hopkins's other retaliation claims, Defendants argue on this claim that Hopkins did not engage in "protected activity" under the FMLA, arguing instead that he never requested FMLA leave.

56. Defendants rely on a regulation that "explicitly permits employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances." *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 614 (6th Cir. 2013) (citing 29 C.F.R. § 825.302(d)). MWR's employee manual requires employees to give thirty days written notice of a need for foreseeable FMLA leave, along with a health care provider's certification of the need for leave. (Def.'s Mot. Summ. J. Ex. 1 p. 51.) Defendants argue that Hopkins did not engage in protected activity because it is

undisputed that he never formally requested FMLA leave in accordance with company policy.[4]

57. The Court, however, concludes that Hopkins's failure to provide a thirty-day written notice of his request for FMLA leave does not defeat his *prima facie* case under these facts. The parties do not dispute that in March 2014, Hopkins and Brown scheduled his surgery to occur in November 2014 after the last race of the season. (Hopkins Dep. 329:21–25.) Based on his original surgery date, Hopkins was therefore still in compliance with the thirty-day advance notice requirement at the time he was terminated. On July 30, 2014, following a particularly painful race, Brown rescheduled Hopkins's surgery at Hopkins's request to occur nine days later on August 7, 2014. In light of Hopkins's evidence of the deterioration in his medical condition and the urgent need for medical intervention, the Court finds that a jury could reasonably conclude that Hopkins could not have known thirty days prior to August 7 that his surgery—and thus his leave—would not occur several months later as originally planned.

58. The Court therefore concludes that Hopkins has presented evidence which would permit a reasonable jury to conclude that "unusual circumstances justif[ied] [his] failure to comply" with MWR's FMLA policy. 29 CFR § 825.302(d); *see also Dotson v. Pfizer*, 558 F.3d 284, 293 (4th Cir. 2009) (holding that "no 'magic words' are necessary to invoke the protection of the FMLA"); *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997) ("[W]here an employee's need for FMLA leave is

_____

[4] Defendants do not challenge the sufficiency of Hopkins's health care provider's certification of the need for leave.

unforeseeable, the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason."). Hopkins thus has made a *prima facie* showing that he engaged in protected activity by seeking FMLA leave to accommodate his accelerated surgery.

59. Under the same temporal proximity analysis applied to his other retaliation claims and pointing to the same evidence, the Court concludes that Hopkins has also offered proof of a causal connection between the protected activity and his termination. Thus, Hopkins has established a *prima facie* claim for FMLA retaliation. *See Hughes v. B/E Aero, Inc.*, No. 1:12CV717, 2014 U.S. Dist. LEXIS 29535, at *28–29 (M.D.N.C. Mar. 7, 2014) (holding plaintiff met *prima facie* burden for FMLA retaliation where only eight days passed between protected activity and termination).

### iv. *Prima Facie* Case – Failure to accommodate

60. In addition to his claims of ADA retaliation and ADA discrimination, Hopkins asserts a claim for failure to make a reasonable accommodation, also in violation of the ADA. To establish a *prima facie* case for failure to accommodate, Hopkins must show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Feldman v. Law Enforcement Assocs. Corp.*, 779 F. Supp. 2d 472, 481 (E.D.N.C. 2011). Hopkins alleges

that MWR "repeatedly den[ied him] a requested reasonable accommodation, his shoulder surgery and leave, under 42 U.S.C. § 12112(b)(5)(A)." (SAC ¶ 94.)

61. Defendants acknowledge that granting a request for leave to obtain surgery can qualify as a reasonable accommodation. *See, e.g., Haschmann v. Time Warner Entm't Co., L.P.*, 151 F.3d 591, 601 (7th Cir. 1998) (holding that a jury could have concluded that a defined period of leave would have been a reasonable accommodation). Defendants argue, as they did against Hopkins's FMLA retaliation claim, that Hopkins was not denied a reasonable accommodation of leave because he never made a formal request for leave. (Defs.' Mem. Supp. Summ. J. 26.) Having previously concluded that Hopkins has advanced sufficient allegations that he requested FMLA leave and was denied it by being terminated the day before his leave was to begin, the Court likewise concludes that Hopkins has satisfied his initial burden in demonstrating that he was denied a reasonable accommodation under the ADA.

v. <u>Nondiscriminatory Reason</u>

62. Because Hopkins has satisfied his burden to show a *prima facie* case for his discrimination, retaliation, and failure to accommodate claims, the burden next shifts to MWR to articulate a nondiscriminatory reason for terminating Hopkins. MWR states that it fired Hopkins for violating "MWR's policies prohibiting the removal or improper possession of company property, and for dishonesty surrounding the investigation." (Defs.' Mem. Supp. Mot. Summ. J. 22.) Defendants' alleged reason for terminating Hopkins is well documented, and thus Defendants have met their

burden of production for purposes of this Motion. *See Kozlowski v. Hampton Sch. Bd.*, 77 Fed. Appx. 133, 140 (4th Cir. 2003) (describing the burden of producing evidence of a nondiscriminatory reason as "usually easy").

      vi.   Pretext

63.    As the last part of the burden-shifting framework, Hopkins can avoid summary judgment against him by offering evidence showing that Defendants' purported reason for terminating him was a pretext for unlawful discrimination or retaliation. "That is to say, [Hopkins] must present *some* evidence creating a genuine dispute concerning the truth of the Defendants' proffered reason for discharging him, such that a reasonable trier of fact could find that the 'real reason' underlying [Hopkins's] discharge was" the exercise of his rights under the ADA, FMLA, or REDA. *Propst*, 148 F. Supp. 3d at 527.

64.    A plaintiff can establish pretext by showing that the defendant's explanation for an employment decision is "unworthy of credence" and by offering other circumstantial evidence probative of intentional discrimination. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). To succeed, a plaintiff cannot rely on "conclusory allegations of discrimination" and instead must present "concrete particulars" going beyond a "mere scintilla of evidence . . . concerning pretext." *Propst*, 148 F. Supp. 3d at 527 (internal punctuation and citations omitted).

65.    "When an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the

plaintiff's termination." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted). Consistent with this rule, when presented with opinion testimony, the perception of the decision-maker is relevant, while the plaintiff's own self-assessment is not. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996); *Duffy v. Belk, Inc.*, 477 F. App'x 91, 98 (4th Cir. 2012) (holding that plaintiff's own belief that he was qualified for a promotion he was denied was irrelevant). Therefore, Hopkins's perception that MWR's decision-makers wrongly concluded that he answered questions inconsistently or untruthfully is not relevant to the Court's analysis. (Pl.'s Resp. Opp. Defs.' Mot. Summ. J. 5; Pl.'s Br. Supp. Mot. Summ. J. 15–16.)

66. As an initial matter, "temporal proximity, standing alone, is often insufficient to establish a jury question regarding pretext," although it "may still be considered when determining whether a plaintiff has established a jury question regarding pretext." *EEOC v. Safelite Glass Corp.*, No. 4:10-CV-102-F, 2012 U.S. Dist. LEXIS 112042, at *23–24 (E.D.N.C. Aug. 9, 2012). Under the *McDonnell Douglas* burden-shifting framework, an employer's articulation of a nondiscriminatory reason merely rebuts the presumption of discrimination; the "trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves*, 530 U.S. at 143. Therefore, the close proximity between Hopkins's demand to reschedule his surgery on July 30, 2014 and his termination on August 6, 2014, is relevant to a determination of pretext. The timing, however, does

not, on its own, raise a genuine issue of material fact calling into question MWR's proffered reason for terminating Hopkins. *Lewis v. Gibson*, No. 1:12CV1189, 2014 U.S. Dist. LEXIS 172853, at *43 (M.D.N.C. Dec. 15, 2014) (quoting *Shoaf v. Kimberly-Clark Corp.*, 294 F. Supp. 2d 746, 758 (M.D.N.C. 2003)) ("Plaintiff cannot rely on temporal proximity alone to establish pretext.").

67.    To accompany his argument of temporal proximity, Hopkins also argues that his firing on the eve of his surgery was discriminatory and retaliatory because he was the only pit crew member in recent years not to delay worker's compensation surgery until the end of the season and that all who did were not terminated.  Indeed, Hopkins asserts that Brown informed him that the "common practice" was to delay surgery until the end of the season. (Hopkins Dep. 328:9–10.)

68.    For further support, Hopkins points to evidence suggesting that Adam Mosher, a former tire changer and MWR's Strength and Conditioning Coach, needed surgery on both his shoulder and his ankle at one point, delayed those surgeries until the end of the season, and remained employed. (Brown Dep. 150:5–21.) Similarly, Hopkins cites the case of Shannon Myers, Hopkins's position coach, because he delayed plantar fasciitis surgery until the end of the race season and remained employed. (Brown Dep. 154:24–155:2.) Myers himself stated he was out of the office for six weeks recovering, "[a]nd luckily I did it in the off season, so there wasn't a rush to get back.  It was only a rush to make sure I was healthy first." (Myers Dep. 55:16–19.)

69. In addition, Hopkins has offered evidence of statements from his coaches and other superiors at MWR displaying skepticism that Hopkins's shoulder injury was severe and musing that he was using the injury as an excuse for poor performance. For instance, Norris does not dispute that he made a statement to Hopkins, following Hopkins's poor performance at a race in Indianapolis where Hopkins lost his temper in a conversation with MWR's owner, that "[i]t was kind of coincidental that the week after . . . you requested surgery. It seems like you don't have the best interest of the company in mind." (Norris Dep. 357:9–16; Answer ¶ 25.) These comments are relevant to pretext because the law provides an avenue for employers who legitimately doubt the validity of an employee's need for medical treatment. *See* 29 U.S.C. § 2613 (c)–(d). There is no evidence that MWR ever attempted to pursue such procedures, and the Court concludes that a reasonable jury could consider MWR's skepticism as circumstantial evidence of discrimination.

70. Hopkins has also produced evidence, outlined below in the Court's discussion of Plaintiff's Motion for Summary Judgment, that MWR afforded Hopkins great responsibility and latitude in handling MWR's clutch guns, such that his removal of the 035 Gun from MWR's premises would not ordinarily have called into question his loyalty or motives.

71. In summary, Hopkins has produced evidence that (i) he was terminated just one week after demanding that his surgery be rescheduled as soon as possible and to a time prior to the end of the season, (ii) MWR looked more favorably on pit crew members who delayed worker's compensation surgery and leave until after the race

season ended, (iii) his supervisors, including the decision-makers here, expressed views that he was using his shoulder injury as an excuse for his poor performance and to avoid termination, and (iv) his removal of the 035 Gun from MWR's premises was not a significant breach of trust in the circumstances. Taking all of this evidence together, the Court concludes that Hopkins has forecast sufficient evidence at this stage of the litigation such that a reasonable jury could find MWR's articulated justification for terminating Hopkins unworthy of credence and conclude that MWR in fact terminated Hopkins because he sought to exercise his rights under the ADA, FMLA, and REDA. The Court therefore denies summary judgment seeking dismissal of these claims.

### b. FMLA interference

72. Unlike his claim for FMLA retaliation, Hopkins's claim for FMLA interference is not resolved under *McDonnell Douglas* burden-shifting. In order to succeed on his FMLA interference claim, Hopkins must establish that (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled. *Alexander v. Carolina Fire Control, Inc.*, 112 F. Supp. 3d 340, 346 (M.D.N.C. 2015) (quoting *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)). Even if an employee proves FMLA interference,

> [the statute] provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost "by reason of the violation," [29 U.S.C.] § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation,"

§ 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B).

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

73. Hopkins contends that MWR interfered with his FMLA rights by discouraging him from taking FMLA leave before the end of the racing season. "Interfering with the exercise of an employee's rights . . . include[s] . . . discouraging an employee from using [FMLA] leave." 29 CFR § 825.220(b). MWR seeks summary judgment on the theory that Hopkins has not produced evidence that MWR discouraged him from taking FMLA leave and that Hopkins was not prejudiced by MWR's alleged discouragement.

74. As an initial matter, the Court concludes that Hopkins has advanced sufficient evidence demonstrating that Defendants discouraged him from taking FMLA leave. Defendants' evidence generally indicates that "[i]t was always up to the patient or athlete's discretion when they wanted to have their surgery," (Brown Dep. 121:18–23), and other pit crew members confirm that Hopkins's spoke openly of his own desire to complete the season with his team before getting surgery, (Coleman Dep. 90:16–23).

75. Hopkins, however, has presented evidence that he expressed his desire to have surgery prior to the end of the season but was encouraged to keep working. Hopkins specifically alleges that in June 2014, he told his pit crew chief, Brian Pattie, that he wanted to move up the date of his surgery, to which Pattie replied, "'Please don't do that. Let's just' — 'at least wait until we make the [Chase]. I really need

you.'" (Hopkins 335:6–14.)[5] Coupled with Hopkins's evidence set forth above suggesting that MWR's common practice was to encourage pit crew members to wait to have surgery until the end of the season, the Court concludes that a jury considering Hopkins's evidence could reasonably conclude that Hopkins clearly asserted his intent to exercise his FMLA rights and was dissuaded by one of his superiors.

76. As such, the Court determines that the competing evidence reveals a genuine issue of material fact as to whether MWR interfered with Hopkins's FMLA rights by discouraging him from obtaining surgery at an earlier date. *See Alexander*, 112 F. Supp. 3d at 347 (finding sufficient evidence of discouragement-based interference where employer encouraged employee to pursue an alternative work arrangement instead of taking FMLA leave).

77. Defendants next argue that Hopkins was not prejudiced by MWR's purported discouragement because MWR immediately re-scheduled his surgery upon request; in other words, Defendants argue that Hopkins was not harmed because MWR agreed to allow him to begin his FMLA leave on the new date of his surgery. (Defs.' Br. Supp. Mot. Summ. J. 28–29.) The fact that MWR agreed to reschedule Hopkins's surgery and FMLA leave does not preclude a finding of prejudice, however, because Hopkins never had the opportunity to enjoy any of his FMLA rights. MWR terminated Hopkins on the day before his FMLA leave was to begin.

---

[5] The "Chase" is NASCAR's annual playoff system that ultimately determines that season's Sprint Cup Series champion. (Defs.' Br. Supp. Mot. Summ. J. 6 n.4.)

78. Indeed, termination that effectively denies FMLA leave can sustain an interference claim because FMLA interference claims apply when employers unlawfully "interfere with, restrain, *or deny the exercise of*" FMLA rights. *Ragsdale*, 535 U.S. at 87 (quoting 29 U.S.C. § 2615(a)(1)) (emphasis added). Thus, the prejudice inquiry is not focused merely on MWR's encouragement to delay FMLA leave but also on MWR's termination of Hopkins's employment on the day before his leave was to begin. *See, e.g.*, *Alexander*, 112 F. Supp. 3d at 348 ("[I]t appears that an employee's termination and the surrounding consequences may be properly considered in the context of an FMLA interference claim.").

79. Under that broader analysis, Hopkins has offered sufficient proof that because of MWR's alleged interference in the exercise of his rights under the FMLA, he suffered prejudice in the form of "lost compensation or benefits" or "some loss in employment status" when he was terminated. *Ranade v. BT Ams., Inc.*, 581 F. App'x 182, 184 (4th Cir. 2014). Therefore, the Court concludes that Hopkins has offered sufficient evidence in support of his FMLA interference claim under Rule 56, and the Court denies summary judgment on that claim.

c. <u>Wrongful Discharge in Violation of Public Policy</u>

80. North Carolina recognizes a claim for wrongful discharge in violation of express statements of public policy. *Whitings v. Wolfson Casing Corp.*, 173 N.C. App. 218, 221, 618 S.E.2d 750, 752 (2005). REDA is one such source of public policy that "establish[es] an employee's legally protected right of pursuing a workers' compensation claim." *Id.* at 222, 618 S.E.2d at 753.

81.     Hopkins is permitted to pursue "both a statutory claim under REDA and a common law claim for wrongful discharge based on a violation of REDA." *White v. Cochran*, 216 N.C. App. 125, 133, 716 S.E.2d 420, 426 (2011); *Whitings*, 173 N.C. App. at 222, 618 S.E.2d at 753 ("An action pursuant to REDA is a supplemental remedy to the common law claim of wrongful discharge.")  Therefore, because the Court has concluded that Hopkins's REDA claim survives summary judgment, his wrongful discharge claim must survive as well.  *See generally Tarrant v. Freeway Foods of Greensboro, Inc.*, 163 N.C. App. 504, 593 S.E.2d 808 (2004) (reversing dismissal of REDA claim and wrongful discharge in violation of public policy claim on the same grounds).

    d.  Defamation

82.     Hopkins specifically alleges that Defendants committed slander *per se* by making defamatory statements to Lauletta, the President of Chip Ganassi Racing, and Peet, the pit coach at Chip Ganassi Racing.  (SAC ¶¶ 45–46.)

83.     To recover for defamation, "a plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation."  *Tyson v. L'eggs Prods., Inc.*, 84 N.C. App. 1, 10–11, 351 S.E.2d 834, 840 (1987).  Slander *per se* is a particular kind of defamation defined as "an oral communication to a third party which amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome

disease." *Phillips v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 117 N.C. App. 274, 277, 450 S.E.2d 753, 756 (1994). When a statement falls into one of these three categories, "malice and damages are deemed presumed by proof of publication, with no further evidence required as to any resulting injury." *Boyce & Isley v. Cooper*, 153 N.C. App. 25, 30, 568 S.E.2d 893, 898 (2002).

84. In order to be slanderous *per se*, defamatory words "must be susceptible of *but one meaning* and of such a nature that *the court* can presume as a *matter of law* that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." *Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 317–18, 312 S.E.2d 405, 409 (1984) (citation omitted). Constitutional limits on the regulation of speech dictate that defamatory statements are not actionable if they "cannot 'reasonably [be] interpreted as stating actual facts' about an individual[.]" *Daniels v. Metro Magazine Holding Co., LLC*, 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). Moreover, "to fall within the class of slander *per se* as concerns a person's trade or profession, the defamatory statement must do more than merely harm a person in [his] business." *Market Am., Inc. v. Christman-Orth*, 135 N.C. App. 143, 151, 520 S.E.2d 570, 577 (1999) (citations and quotation marks omitted). The false statement "(1) must touch the plaintiff in [his] special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on [his] business." *Id.*

85.	Hopkins alleges that Norris defamed him by telling Lauletta that Hopkins "had filed a lawsuit, . . . was fired for stealing, and . . . had no right to work for [Chip Ganassi Racing]." (SAC ¶ 46.) Norris also allegedly defamed Hopkins by telling Peet that Hopkins "stole from MWR and . . . was not allowed to work in NASCAR at all." (SAC ¶ 46.) Chip Ganassi Racing cut its ties with Hopkins after Norris made these alleged statements to Lauletta and Peet. (SAC ¶ 46.)

86.	Only Norris, Lauletta, and Peet were party to the conversations on which Hopkins's defamation claim is based. Hopkins's testimony as to his second-hand knowledge about what Norris said to Lauletta and Peet is thus inadmissible hearsay, which the Court cannot consider at summary judgment. *See Borden, Inc. v. Brower*, 17 N.C. App. 249, 253, 193 S.E.2d 751, 753, *rev'd on other grounds by* 284 N.C. 54, 199 S.E.2d 414 (1973); *see also Strickland v. Doe*, 156 N.C. App. 292, 297, 577 S.E.2d 124, 129 (2003) (holding that an attorney's letter containing a private investigator's summary of an interview with a witness was inadmissible hearsay and could not be considered at summary judgment).

87.	Lauletta testified only that Norris told him that it was not right for Hopkins to work out at Chip Ganassi Racing at the time, (Lauletta Dep. 26:11–14), and that Norris mentioned "IP rights," (Lauletta Dep. 25:24–25). Norris confirmed that he told Lauletta that "there was a termination for cause . . . over IP protection." (Norris Dep. 536:23–537:1.) Peet's deposition testimony states that Norris only told him that Hopkins "wasn't allowed to be at Chip Ganassi Racing, . . . it was either a violation of

his contract or a violation of the labor board," (Peet Dep. 64:4–7), and that MWR had footage of Hopkins removing the 035 Gun from the premises, (Peet Dep. 82:1–4.)

88.     It is not disputed that Hopkins removed the 035 Gun, and thus Norris's alleged statement to Peet to that effect cannot be defamatory. *Long v. Vertical Techs., Inc.*, 113 N.C. App. 598, 602–03, 439 S.E.2d 797, 801 (1994) ("[I]n order to be actionable, the defamatory statements must be false. The truth of a statement is a complete defense.").

89.     Norris's statements that it was not "right" or that Hopkins "wasn't allowed" to be at Chip Ganassi Racing do not qualify as slander *per se*. In determining whether a statement is susceptible of only one defamatory meaning, "the question always is how would ordinary men naturally understand the publication." *Renwick*, 310 N.C. at 318, 312 S.E.2d at 409 (citations omitted). Here, Norris's statements are clearly understood as expressions of Norris's opinion of MWR's legal rights in light of Hopkins's non-compete and his "internship" with Chip Ganassi Racing. *See Kingsdown, Inc. v. Hinshaw*, 2016 NCBC LEXIS 15, at *38 (N.C. Super. Ct. Feb. 17, 2016) (holding that statement to a newspaper that pending litigation claims were "reckless" were fairly understood as statements of opinion rather than objective, verifiable facts); *see also, e.g.*, *Shorter v. Peaches Uniforms, Inc.*, No. 2:10-cv-02232-MCE-GGH, 2013 U.S. Dist. LEXIS 9228, at *32 (E.D. Cal. Jan. 22, 2013) (holding that "statement that [p]laintiff signed a non-compete is not defamatory because it does not lower [p]laintiff's personal or professional reputation").

90. Finally, Norris's alleged statement that Hopkins was terminated "for cause" "over IP protection" is not so clear, specific, and unambiguous as to be susceptible of only one defamatory meaning. Indeed, employers and employees regularly define in their private employment contracts what constitutes "cause," which the parties did here. As such, "cause" is not "susceptible of but one meaning" to the listener and may include a range of activity from intentional, willful misconduct, on the one hand, to a material breach of the agreement, on the other.

91. Consequently, courts frequently conclude that a statement that an individual was terminated for cause does not constitute slander *per se*. *See, e.g.*, *No Witness, LLC v. Cumulus Media Partners, LLC*, No. 1:06-CV-1733 JEC, 2007 U.S. Dist. LEXIS 83761, at *13–14 (N.D. Ga. Nov. 13, 2007) (holding that, under Georgia law, "the statement that '[plaintiff] was fired for cause' is not necessarily defamatory on its face. . . . These words could imply that misconduct led to the termination of [plaintiff], but this implication is not necessary from the face of the words alone."); *Skopp v. First Fed. Sav.*, 545 N.E.2d 356, 359 (Ill. App. Ct. 1989) ("[A] statement that an individual has been terminated 'for cause' conveys little more than the obvious information that the person did not leave his or her employment voluntarily."); *Abella v. Barringer Res.*, 615 A.2d 288, 291 (N.J. Super. Ct. Ch. Div. 1992) (citing *Shebar v. Sanyo Business Systems Corp.*, 544 A.2d 377 (N.J. 1988)) ("Typically, the fair and natural import of the statement that a person was 'terminated for cause' is only that the termination was not arbitrary.").

92.     Here, where the allegedly defamatory statement taken as a whole does not identify Hopkins's specific conduct giving rise to his termination, the Court cannot conclude that the statement, on its face, impeaches Hopkins in his trade or profession or otherwise imputes to him conduct "derogatory to his character and standing as a business man and tending to prejudice him in his business." *Boyce*, 153 N.C. App. at 30, 568 S.E.2d at 898 (quoting *Badame v. Lampke*, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955)); *see also Long*, 113 N.C. App. at 603, 439 S.E.2d at 801 (holding that statements by a corporate officer that other officers were "not handling business correctly" and "doing something shady" were insufficient to support a slander *per se* claim).

93.     It is possible that the statement that Hopkins was terminated for cause over IP protection could rise to the level of slander *per quod*. *Stutts v. Duke Power Co.*, 47 N.C. App. 76, 82, 266 S.E.2d 861, 865 (1980) (stating that alleged false statements by employer that are not *per se* defamatory could be actionable under a *per quod* theory). Hopkins, however, has pleaded his claim only on a *per se* theory, (SAC ¶ 55), and no evidence has otherwise been offered to support a *per quod* theory.

94.     Accordingly, for the reasons set forth above, the Court concludes that summary judgment should be granted dismissing Plaintiff's claim for defamation.

e.   Tortious Interference

95.     Hopkins alleges that Norris wrongfully interfered with Hopkins's contracts or business relationships with Chip Ganassi Racing and Turner Motorsports.[6]

---

[6] In pleading claims for tortious interference, the Second Amended Complaint refers to "John Doe Race Team" ("JDRT") and "another race team" ("ART"). (SAC ¶¶ 45–46.) The parties'

Hopkins brings alternative claims for tortious interference with contract and tortious interference with prospective economic advantage.

96. In order to succeed on a claim for tortious interference with contract, a plaintiff must show:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

97. The similar claim for tortious interference with prospective economic advantage requires proof that "the defendants acted without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'" *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000) (citation omitted). "[A] plaintiff's mere expectation of a continuing business relationship is insufficient" to satisfy the "but for" causation element of such a claim. *Beverage Sys. of the Carolinas, LLC v. Assoc. Bev. Repair, LLC*, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016).

98. Hopkins first alleges that he had an oral contract with Chip Ganassi Racing to serve as an unpaid intern on the team's "developmental pit crew" until his non-compete expired. (SAC ¶ 60.) The non-compete prevented Hopkins from working for pay for other NASCAR Nationwide Series or Sprint Cup Series teams. (Employment

---

briefs acknowledge that JDRT refers to Chip Ganassi Racing and ART refers to Turner Motorsports.

Agreement ¶ 8.) Hopkins has failed to produce any evidence, however, of a binding contract with CGR.

99. Specifically, Hopkins argues that in exchange for access to CGR's facilities, he provided services to CGR by coaching the developmental pit crew. (Pl.'s Mem. Opp. Defs.' Mot. Summ. J. 36.) However, Hopkins has failed to present any evidence of a bargained for exchange giving rise to a binding contract, and he admitted in his deposition that he never had a contract with CGR. (Hopkins 45:23–46:1.) Peet confirms the lack of a binding contract by describing the developmental pit crew members as "complete volunteers," (Peet Dep. 53:9–15), and confirming that Hopkins had no "duties or responsibilities" at CGR, (Peet Dep. 62:7–11).

100. Therefore, because Hopkins has failed to produce evidence of a valid contract with CGR, the Court must grant summary judgment on Hopkins's claim for tortious interference with contract with regard to his alleged contract with Chip Ganassi Racing.

101. Hopkins has, however, forecast evidence that he reasonably expected to enter into a contract with Chip Ganassi Racing as a front tire changer. *See Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 680, 412 S.E.2d 636, 645 (1992) (reversing summary judgment on tortious interference with prospective economic advantage where plaintiff had a "reasonable expectation" of continuing to do business with its existing customers). Hopkins's evidence shows that Peet, as the pit crew coach, had the authority to make hiring decisions for CGR's pit crew, (Lauletta Dep. 10:10–11:4), that CGR was interested in eventually signing Hopkins as a tire changer, (Peet Dep.

91:19–92:1), and that Peet regarded Hopkins as the most talented member of the developmental pit crew, (Peet Dep. 92:15–18). Hopkins even got fitted for a fire suit at CGR's direction. (Hopkins Aff. ¶ 4.)

102. It is undisputed that CGR cut its ties with Hopkins after Norris confronted Lauletta and Peet about MWR's dispute with Hopkins. (Lauletta Dep. 19:5–9.) Defendants nevertheless argue that Norris was justified in confronting Lauletta and Peet because Norris was protecting MWR's rights under the non-compete. *See Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988) ("If, however, the defendant is acting for a legitimate business purpose, his actions are privileged.").

103. Justified interference, however, is conditional; the privilege "is lost if exercised for a wrong purpose . . . where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved." *Id.* at 220, 367 S.E.2d at 650 (quoting *Smith v. Ford Motor Co.*, 289 N.C. 71, 91, 221 S.E.2d 282, 294 (1976)). Here, the Court concludes that even though Hopkins has failed to sustain his defamation claim, he has brought forward sufficient evidence to permit a rational factfinder to conclude that Norris's statements were false and communicated not to protect MWR's interest but instead to harm Hopkins. As such, the Court must deny summary judgment on Hopkins's claim that Norris tortiously interfered with his expected contract as a tire changer for CGR.

104. Next, the Court addresses Hopkins's tortious interference claim based on his alleged contract with Turner Motorsports. Starting as early as 2011, Hopkins

had served as a tire changer on an independent contractor basis for a couple of Truck Series teams, specifically Turner Motorsports and NTS. (Peet Dep. 29:4–19.) Hopkins secured these odd jobs through Peet, who helped compile pit crews for each race. CGR was not involved. (Peet Dep. 22:14–23:13.) Pit crew members were paid per race under this agreement. (Peet Dep. 89:15–22.) Hopkins alleges that Norris's unjustified interference caused Turner Motorsports and/or NTS to breach existing contracts and/or refrain from entering contracts with Hopkins to pit these races.

105. Defendants contend that this claim must fail because Norris had no knowledge of Hopkins's alleged contract with either Turner Motorsports or NTS. A defendant need not have actual knowledge of the contract for purposes of a tortious interference with contract claim; "if [the defendant] knows the facts which give rise to the plaintiff's contractual rights against the third person," the law will still impute knowledge of the contract "even though he is mistaken as to their legal significance and believes that there is no contract or that the contract means something other than what it is judicially held to mean." *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 151, 555 S.E.2d 281, 290 (2001). In *Reichhold Chemicals*, the trial court imputed knowledge of the underlying contract to the defendant where the defendant did not have actual knowledge that the contract existed but "knew of the business relationship" between plaintiff and the third party. *Id.*

106. Here, the parties do not dispute that Norris knew of Hopkins's relationship with CGR; indeed, Norris only began communicating with CGR, Lauletta, and Peet after receiving reports that Hopkins had been seen in public wearing CGR clothing.

(Norris Dep. 526:1–13.) From the descriptions of the alleged statements, as laid out in the defamation claim section above, it is clear that Norris spoke to Lauletta and Peet in their capacities as members of CGR. However, Hopkins obtained his periodic contracts with Turner and NTS through Peet, and Peet has stated that his work with Turner and NTS was completely independent of his work for CGR. (Peet Dep. 22:14–21; 23:4–13.)

107. Therefore, applying the rule from *Reichhold Chemicals*, Norris could be charged with knowledge of a contract between Hopkins and CGR, because he knew of their professional relationship. However, the law will not impute to Norris knowledge of Hopkins's contracts with Turner and NTS where there is no evidence that Norris had knowledge of Hopkins's relationship with Turner and NTS or Peet's role in connecting Hopkins to Turner and NTS. The Court must therefore grant Defendants summary judgment on Plaintiff's claim for tortious interference with contract as to the alleged contracts with Turner and NTS.

108. Although Hopkins's claim for tortious interference with contract as to Turner and NTS must fail, Hopkins's evidence is sufficient to survive summary judgment on his claim for tortious interference with prospective economic advantage with these same two entities. Hopkins has produced evidence that Peet wanted to have him in the pit crew for Turner Motorsports for the last three races of the season, (Peet Dep. 89:11–22), but that no offer was ever made because of the allegations made by Norris, (Peet Dep. 105:3–106:21). As discussed above, a jury could reasonably conclude that Norris was not justified in interfering with Hopkins's relationship with

CGR and Peet and thus find that Norris tortiously interfered with Hopkins's business relationship with Turner Motorsports and NTS. Accordingly, summary judgment must therefore be denied on this ground.

   f. <u>Damages</u>

109. Finally, Defendants contend that if any of Hopkins's claims survive summary judgment, his recoverable, non-exemplary damages should be capped at $210,624, which is the amount of back pay calculated by Plaintiff's proposed expert witness. (Defs.' Mem. Supp. Mot. Summ. J. 38.) In particular, Defendants argue that Hopkins should not be entitled to back pay or front pay beyond August 6, 2014, because MWR would have terminated Hopkins on that day after allegedly discovering that Hopkins had printed and removed Confidential Documents. *See McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 362 (1995) (holding that when an employer discovers conduct for which it would have terminated an employee, back pay should be calculated from the date of the unlawful discharge to the date the new information was discovered). Defendants' position, however, depends on a determination that the conduct was so severe that MWR would have fired Hopkins on those grounds alone, which implicates the factual disputes at the center of this case. Furthermore, an award of front pay appears to be possible under Fourth Circuit precedent even where the employer is no longer in business. *See Jones v. SouthPeak Interactive Corp.*, 986 F. Supp. 2d 680, 685 (E.D. Va. 2013). As such, the Court concludes that resolution of this issue on this ground at summary judgment is inappropriate.

110. Defendants challenge other aspects of Hopkins's alleged damages on various additional grounds by making relatively brief arguments, which did not receive a great deal of attention at the lengthy hearing on the Motions. As a result, and given the large number of claims advancing to trial and supporting a potential award of damages, the Court elects to defer ruling on this aspect of Defendants' Motion for Summary Judgment until the motion *in limine* phase of this case to permit additional briefing and argument concerning these important issues prior to resolution.

B. Plaintiff's Motion for Summary Judgment

    a. Breach of Contract

111. Defendants allege that Hopkins breached his Employment Agreement by allegedly misappropriating MWR's clutch guns, sockets, and confidential documents, and by lying in MWR's subsequent investigation. (Countercl. ¶¶ 133–35.) Defendants allege that these acts were in breach of provisions in the Employment Agreement itself, which barred Hopkins from disclosing MWR's Confidential Information to others or "mak[ing] use of any Confidential Information for his own purposes." (Employment Agreement ¶ 7.) Defendants also allege that Hopkins breached certain provisions of MWR's Employee Manual that similarly restricted him from removing property from the company's premises. (Countercl. ¶¶ 88, 99.)

112. The Court first addresses the alleged breaches of the Employee Manual. Plaintiff contends that MWR's Employee Manual is not a binding contract. Indeed, the Employee Manual contains a disclaimer that it should not "be construed as being or creating any terms or conditions of an employment contract express or implied."

(Defs.' Mot. Summ. J. Ex. 1 p 2.) Nevertheless, MWR contends that the Employee Manual was incorporated into the Employment Agreement through paragraph 3 of the Employment Agreement: "Employee acknowledges receipt of the Company's policies and procedures and Employee covenants and agrees to comply with such policies and procedures now in force and from time to time adopted by the Company." (Employment Agreement ¶ 3.)

113. "[T]he law of North Carolina is clear that unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it." *Walker v. Westinghouse Elec. Corp.*, 77 N.C. App. 253, 259, 335 S.E.2d 79, 83–84 (1985). The Court concludes that the general reference obligating Hopkins to follow MWR's policies and procedures in Paragraph 3 is insufficient to satisfy the standard of express incorporation required under the law. Our courts have held that employment contracts expressly incorporated employee handbooks into their terms where they used language conditioning the employment relationship on acceptance of the terms of a specific source of company policy. *See generally Mayo v. N.C. State Univ.*, 168 N.C. App. 503, 508 n.2, 608 S.E.2d 116, 121 n.2, *aff'd*, 360 N.C. 52, 619 S.E.2d 502 (2005) ("Your employment is subject to all policies adopted and amended by the UNC Board of Governors and by the NCSU Board of Trustees."); *Black v. W. Carolina Univ.*, 109 N.C. App. 209, 213, 426 S.E.2d 733, 735 (1993) ("This appointment is subject to the WCU Tenure Policies and Regulations as found in the Faculty Handbook, dated 1988-89, including any future amendments thereto.").

114. In contrast, our courts have not found express incorporation of an employee manual where the employment agreement merely recites compliance with company policy as one of the employee's duties. For example, in *Rajpal v. Livingstone College, Inc.*, the Court of Appeals held that the following language failed to expressly incorporate the manual into the employment contract and did not demonstrate intent to be bound by *both* parties: "The faculty member agrees to fulfill the following responsibilities: . . . The faculty member will abide by the policies and procedures as outlined in the Faculty Handbook and administrative memoranda." No. COA10-529, 2011 N.C. App. LEXIS 1189, at *4 (N.C. Ct. App. June 21, 2011) (unpublished)). Like the employment contract in *Rajpal*, MWR's Employment Agreement merely recites Hopkins's duty to follow company policy; it does not expressly incorporate the terms of the Employee Manual such that both parties agreed to be contractually bound by the Manual's terms.

115. MWR further points to Hopkins's admission that he was required to follow the terms of the Employee Manual. (Hopkins Dep. 114:13–17.) However, Hopkins's admission does not concede that the Manual was a binding contract. For the reasons stated above, MWR has failed to demonstrate that the terms of the Employee Manual can sustain its claim for breach of contract, and the Court must therefore grant summary judgment on Defendants' claim for breach of the Employee Manual.

116. Moving on to the Employment Agreement itself, Hopkins contends that MWR has not presented evidence of "misappropriation" in breach of his Employment Agreement. Hopkins argues that his return of the 035 Gun and sockets prior to his

termination precludes a finding that he misappropriated MWR's property. (Pl.'s Br. Supp. Mot. Summ. J. 34–35.) In support of that argument, Hopkins points to a provision in his contract obligating him to return all company property to MWR "promptly upon termination." (Employment Agreement ¶ 6(d).) Paragraph 6(d), however, governs Hopkins's duties upon termination.[7] Paragraph 7 establishes his duty, which extends one year beyond the term of the Employment Agreement, not to "make use of any Confidential Information for his own purposes."[8]

117. Defendants argue and have presented evidence that prior to the termination of his employment, Hopkins took the 035 Gun and sockets home for his own use in violation of paragraph 7 of his Employment Agreement. Thus, Defendants have satisfied their burden at this stage of the litigation. *McKinnon v. CV Indus., Inc.*, 213 N.C. App. 328, 333, 713 S.E.2d 495, 500 (2011) (laying out breach of contract elements). Hopkins's evidence that he took the gun home mistakenly and did not use it for any inappropriate purpose, however, raises questions of fact that make summary judgment improper on this counterclaim.

b. Conversion

118. Conversion is the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of

---

[7] Paragraph 6(d) provides, in relevant part: "Promptly upon termination of Employee's employment with the Company . . . Employee shall surrender to the Company all property belonging to the Company . . . including . . . confidential information [and] equipment[.]"

[8] Paragraph 7 provides, in relevant part: "'Confidential Information' includes but is not limited to . . . engineering information, inventions, products, [and] machinery. During the Term and for one year thereafter, Employee will not, in whole or in part, . . . make use of any Confidential Information for his own purpose."

their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (internal quotation marks and citation omitted). "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Id.* "Where there has been no wrongful taking or disposal of the goods, and the defendant has merely come rightfully into possession and then refused to surrender them, demand and refusal are necessary to the existence of the tort." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 310–11, 603 S.E.2d 147, 165 (2004). Here, Defendants claim that Plaintiff converted the 040 Gun, the 035 Gun and sockets, and MWR's Confidential Documents.

119. As an initial matter, the Court concludes that Defendants have not forecast evidence to support their allegations that Plaintiff wrongfully possessed or converted the 040 Gun. Defendants allege that the 040 Gun went missing following a June 2014 race in which Hopkins was the last person to use that piece of equipment. (Countercl. ¶ 67–68.) Norris's own testimony, however, acknowledges that Defendants have not identified any evidence to back up their allegations. Norris stated that 040's disappearance "still is a mystery," (Norris Dep. ¶ 429:7), that he's "not going to make an accusation" against Hopkins, (Norris Dep. ¶ 429:11), and that he "do[es]n't suggest that [Hopkins] took it," (Norris Dep. ¶ 429:21). Defendants have not presented "evidence, beyond mere speculation or conjecture, sufficient for a jury to find every essential element" of their claim in this regard. *Henson v. Green Tree Servicing, LLC*, 197 N.C. App. 185, 189, 676 S.E.2d 615, 618 (2009). The Court,

therefore, must grant summary judgment for Hopkins on MWR's claim for conversion of the 040 Gun.

120. The parties vastly disagree on the facts surrounding Hopkins's alleged removal of MWR's Confidential Documents. Defendants have produced competent evidence to support their allegation that Hopkins wrongfully possessed the Confidential Documents. Don Asberry, MWR's IT manager, has offered sworn testimony that MWR's computer system reflects that the Confidential Documents were accessed on a password-protected computer—to which Hopkins had access—in the pit coach's office and printed to a printer in Walt Smith's office on the afternoon of August 4, 2014. (Asberry Aff. ¶ 11.) MWR's evidence suggests that no one with access to the computer at issue other than Hopkins was near the pit coach's office at the time the documents were accessed and printed. (Defs.' Mem. Opp. Pl.'s Mot. Summ. J. Ex. 30, p 28–29.) Asberry's testimony further indicates that video surveillance shows Hopkins entering Walt Smith's office and then exiting with a handful of papers at approximately the same time as the Confidential Documents were printed on the afternoon of August 4. (Asberry Aff. ¶ 9.)

121. Hopkins has presented some evidence challenging the veracity of Asberry's testimony. In an email sent three days after Hopkins's termination, Norris stated that he learned from Asberry that there was no electronic footprint showing what documents were printed. (Pl.'s Mot. Summ. J. Ex. 4.) Norris's recollection of his conversation with Asberry does not defeat Defendants' evidence, however. It instead creates an issue of credibility to be resolved by the fact finder at trial. *Kessing v. Nat'l*

*Mortg. Corp.*, 278 N.C. 523, 535, 180 S.E.2d 823, 830 (1971) ("If there is any question as to the credibility of witnesses or the weight of evidence, a summary judgment should be denied."). The same is true of Hopkins's general denial asserting that he never printed the Confidential Documents. (Reply ¶ 123; Hopkins Dep. 621:10–23).

122. Hopkins also argues that MWR cannot prove that he accessed the Confidential Documents as it claims because the pit coaches kept a sticky note with log-in information next to the computer, making it effectively accessible to anyone. This testimony does not defeat Defendants' evidence, however, because Hopkins has admitted that he printed non-confidential documents from the computer at issue at approximately the same time the Confidential Documents were printed from that same computer. (Hopkins Dep. 621:10–23.) As such, there are genuine issues of material fact concerning Hopkins's alleged conversion of the Confidential Documents.

123. As for the 035 Gun and the sockets, Hopkins argues that the Court must grant summary judgment on the conversion claim because Hopkins lawfully came into possession of the 035 Gun and sockets on MWR's premises and returned them as soon as Defendants made a demand. (Pl.'s Reply Supp. Mot. Summ. J. 14.) Defendants argue in opposition that Hopkins's possession of the 035 Gun in the pit shop is irrelevant because Hopkins committed an unlawful taking, which gives rise to a conversion claim without a demand and refusal requirement, as soon as he left the premises with the 035 Gun. (Defs.' Br. Opp. Pl.'s Mot. Summ. J. 9.)

124. Under North Carolina law, Hopkins's initial lawful possession of the 035 Gun and sockets on MWR's premises is sufficient to trigger a demand and refusal

requirement. "[W]hen [a party] *lawfully* obtains possession or control and *then* exercises unauthorized dominion or control over the property, demand and refusal become necessary elements of the tort." *Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 83, 712 S.E.2d 221, 227 (2011) (citing *Hoch v. Young*, 63 N.C. App. 480, 483, 305 S.E.2d 201, 203 (1983)). Defendants argue that on the date of the alleged conversion, Hopkins was only authorized to handle the clutch guns if he was transporting the guns to a race, which he undeniably was not doing at that time. (Defs.' Br. Opp. Pl.'s Mot. Summ. J. 9–10.)

125. Defendants' argument ignores, however, other evidence advanced by the parties. In particular, Defendants admit that, in addition to his role transporting the pit guns to races, Hopkins had a responsibility to work with Watson, MWR's in-house engineer, in developing and servicing MWR's clutch guns. (Ans. ¶ 31; Watson Dep. 83:7–24.) Hopkins has stated that he removed the 035 Gun and the sockets from the shock room on August 4 so that he could practice changing lug nuts and test some modifications on the gun. (Hopkins Dep. 511:8–512:19.) Defendants contend that on the date of the alleged conversion, all of Hopkins's alleged responsibilities concerning the race guns had been transferred to Shannon Myers because MWR expected Hopkins to soon be absent for his surgery. (Ans. ¶ 31; Defs.' Br. Opp. Pl.'s Mot. Summ. J. 9–10.) Although it appears undisputed that the responsibility of transporting the pit guns had been shifted to Myers by August 4, (Hopkins Dep. 375:17–376:19), Defendants have not offered evidence suggesting that Hopkins was no longer authorized to handle the pit guns as part of his regular work with Watson.

126. As a result, the undisputed evidence indicates that Hopkins initially exerted lawful control over the 035 Gun and sockets. Consequently, MWR's claim for conversion would not mature under North Carolina law until Hopkins refused to return the materials upon demand. *Stratton*, 211 N.C. App. at 83, 712 S.E.2d at 227. Defendants admit that Hopkins promptly returned the 035 Gun and sockets to MWR upon their demand. The Court therefore must grant summary judgment for Plaintiff on Defendants' claim for conversion of the 035 Gun and sockets. *See, e.g., WNC Holdings, LLC v. Alliance Bank & Trust Co.*, 2012 NCBC LEXIS 53, at *45 (N.C. Super. Ct. Oct. 2, 2012) (dismissing conversion claim where defendant bank promptly returned plaintiff account holder's funds upon demand).

c. <u>Trespass to Chattels</u>

127. Defendants also contend that the same actions underlying their conversion claim give rise to a claim for trespass to chattels. Whereas conversion is the wrongful interference with ownership rights, "the basis of a trespass to chattel cause of action lies in 'injury to possession.'" *Fordham v. Eason*, 351 N.C. 151, 155, 521 S.E.2d 701, 704 (1999) (citing *Motley v. Thompson*, 259 N.C. 612, 618, 131 S.E.2d 447, 452 (1963)). A successful trespass to chattels claim requires proof that the injured party "had either actual or constructive possession of the personalty or goods in question at the time of the trespass, . . . and that there was an unauthorized, unlawful interference or dispossession of the property." *Id.*

128. "Constructive possession is a legal fiction existing when there is no actual possession, but there is title granting an immediate right to actual possession." *Id.*

There is no dispute that MWR had, at a minimum, constructive possession of the 040 Gun, the Confidential Documents, and the 035 Gun and sockets. Therefore, the viability of Defendants' claim rests on whether there was an "unauthorized unlawful interference or dispossession of the property."

129. As discussed above, while Defendants have forecast evidence that Hopkins was the last person who used the 040 Gun, they have not presented non-speculative evidence showing that Hopkins interfered or dispossessed Defendants of the 040 Gun. For that reason, the Court must grant summary judgment on the trespass to chattels claim with respect to the 040 Gun.

130. Next, the same disputed issues of material fact that preclude summary judgment on Defendants' claim for conversion of the Confidential Documents preclude summary judgment on Defendants' claim for trespass to chattels as to those same documents.

131. Last, the Court must deny Plaintiff's motion as to the 035 Gun and sockets. While Defendants' conversion claim did not mature until a demand and refusal had occurred, no such requirement exists for Defendants' trespass to chattels claim. Here, Defendants have offered evidence from which a jury could reasonably conclude that Hopkins was not authorized to possess the 035 Gun at home on the dates when he removed the gun from MWR's premises. As a result, summary judgment on this claim as to the 035 Gun and sockets is not proper. *See Fordham*, 351 N.C. at 159, 521 S.E.2d at 706 (finding a valid claim for trespass to chattels where defendant removed timber over which plaintiff had possessory rights).

d.  Misappropriation of Trade Secrets

132.  Defendants contend that the 040 Gun, the Confidential Documents, and the 035 Gun and sockets constitute MWR's trade secrets under the Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 *et seq.* (the "Trade Secret Protection Act").

133.  "The threshold question in any misappropriation of trade secrets case is whether the information obtained constitutes a trade secret." *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 369, 555 S.E.2d 634, 639 (2001).  Trade secrets are defined as:

> business or technical information . . . that: (a) Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).  Courts balance six factors when determining whether information qualifies as a trade secret:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Combs*, 147 N.C. App. at 369–70, 555 S.E.2d at 640.

134.  In light of the Court's conclusion that Defendants have failed to advance non-speculative evidence that Hopkins took or used the 040 Gun, Defendants' trade secret claim cannot rest on that allegation.

135. Hopkins argues that MWR's clutch guns and related technology do not qualify as trade secrets because MWR did not take sufficient measures to ensure confidentiality, and because the technology could be easily replicated and had little value.

136. MWR alleges that the Confidential Documents contained information relating to its proprietary clutch gun technology and a large amount of data about the pit crew's operations, including performance data for each of MWR's pit crew members throughout the season, training schedules for pit crew members, and evaluations of prospective pit crew members. (Countercl. ¶ 93.) While Hopkins's Motion argues that MWR's "clutch guns and related technology" did not amount to trade secrets, (Pl.'s Mem. Supp. Mot. Summ. J. 26), Hopkins does not challenge the claimed trade secret status of the pit crew performance data, which therefore will be an issue for trial. *See, e.g.*, *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985) (noting that movant "has the burden of establishing the lack of any triable issue of fact").

137. Hopkins first argues that MWR did not make efforts to ensure the secrecy of its clutch gun technology. Viewing all of the evidence in the light most favorable to MWR, however, MWR has presented specific evidence that it took reasonable measures to maintain the secrecy of that information. MWR's employment contracts, including Hopkins's Employment Agreement, contained nondisclosure clauses, which obligated employees to safeguard MWR's confidential material. (Employment Agreement ¶ 7.) The "shock room," where clutch guns were disassembled, serviced,

and repaired, was only accessible to qualified employees with a restricted access security card. (Watson Dep. 38:1–8.) Clutch guns were kept in a case that was generally locked, and only a handful of individuals who worked on the guns had keys. (Watson Dep. 114:11–23.) When pit crew members moonlighted for other race teams and wanted to use an MWR clutch gun, they had to obtain permission from Watson or the pit crew coach. (Watson Dep. 91:10–22; Miller 132:1–23.)

138. MWR's measures to maintain secrecy here compare favorably to the efforts found sufficient in numerous decisions of this Court. *See, e.g., Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *32–33 (N.C. Super. Ct. Apr. 23, 2015) (denying summary judgment where plaintiff locked its facilities, maintained a password-protected database, and secured contractual commitments to protect confidential information); *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *16 (N.C. Super. Ct. May 1, 2015) (denying summary judgment where plaintiff kept its confidential material in locked facilities and included a non-disclosure provision in its employment agreements).

139. Although Hopkins advances evidence suggesting MWR and its employees were lax from time to time in enforcing company policy or keeping the pit guns totally secured, the Court concludes this evidence goes to the weight of Defendants' proof and does not mandate dismissal of Defendants' claim. Indeed, the requirement that a party must undertake reasonable efforts to maintain the secrecy of its trade secrets is "necessarily fact dependent, and courts that have addressed it closely examine the circumstances surrounding the trade secret to determine what measures are

reasonable to maintain its security." *Koch*, 2015 NCBC LEXIS 45, at *15. Viewing the evidence of record in the light most favorable to MWR, the Court cannot conclude that MWR has failed to take reasonable measures to protect its clutch gun technology as a matter of law.

140. Distinct from the evidence regarding MWR's clutch gun technology, Hopkins argues that MWR failed to undertake efforts to maintain the secrecy of the Confidential Documents. Hopkins's evidence indicates that the computer from which MWR alleges he accessed the Confidential Documents was a "community computer" with generic log-in information—the username and password were both "pitcrew"—written down on a sticky note attached to the screen. (Hopkins Dep. 297:14–15; 299:5–6.) On their own, those efforts may be insufficient to satisfy the secrecy concerns of the Trade Secret Protection Act. *See Safety Test*, 2015 NCBC LEXIS 40, at *27–28 (discussing password protection and the Trade Secret Protection Act).

141. The full evidentiary record before the Court, however, reveals that questions of fact remain. While Hopkins allegedly accessed the Confidential Documents from a community computer, that computer was still only accessible to other pit crew members and coaches, all of whom were regularly expected to review race film and other performance data, (Hopkins Dep. 302:2–6). Furthermore, the confidentiality provision that MWR placed in its employment agreements for pit crew members specifically defined Confidential Information to include "technical and engineering data and information, . . . performance data . . . and testing of any kind," which describes the sort of data contained in the Confidential Documents. (Employment

Agreement ¶ 7.) Thus, the Court concludes, on the vast evidentiary record before it, that MWR has not failed as a matter of law to take reasonable efforts to protect the secrecy of its Confidential Documents.

142. Hopkins next argues that MWR's clutch gun technology is not a trade secret because it is not unique and of little value. In support, Hopkins offers evidence that MWR's clutch gun technology could be duplicated by others and that MWR relied on information about other teams' clutch gun programs to get its own program off the ground. (Pl.'s Mem. Supp. Mot. Summ. J. 24–25.)

143. The fact that MWR's technology may be similar to other teams' technology is not determinative, however, because "knowledge of the best combination of processes or systems of combinations of elements may amount to a trade secret" even if some of the component parts are in the public domain. *SCR-Tech, LLC v. Evonik Energy Servs., LLC*, 2011 NCBC LEXIS 27, at *43 n.115 (N.C. Super. Ct. July 22, 2011) (quoting *Biocore, Inc. v. Khosrowshahi*, 96 F. Supp. 2d 1221, 1226 (D. Kans. 2000)). Hopkins has not offered evidence that MWR's clutch gun technology is indistinguishable from another team's technology, nor has he presented non-speculative evidence that MWR's technology could be readily duplicated. When weighing the ease with which an alleged trade secret could be acquired or duplicated by others, "[t]he focus . . . is generally on the amount of effort expended, including both time and money invested, in compiling the trade secret information." *Koch*, 2015 NCBC LEXIS 45, at *13. Furthermore, where a trade secret is comprised of information already known to the public or an industry, "[a] compilation of . . .

available information" can still receive trade secret protection if it is especially difficult to assemble the specific combination alleged to be a trade secret. *Safety Test*, 2015 NCBC LEXIS 40, at *26.

144. Here, MWR has presented evidence that its in-house engineer began researching and developing MWR's clutch guns in September 2013. (Watson Dep. 19:4–9.) MWR's clutch guns were made up of about 20 components with as many unique assemblies. (Watson Dep. 32:6–23.) Hopkins himself was a valuable part of the team because he was able to give specific and helpful feedback to MWR's engineer on how the guns were performing at races, allowing Watson to further calibrate and improve the guns. (Watson Dep. 86:3–24; Hopkins 130:8–13.) Thus, MWR has offered sufficient evidence that its program was unique to MWR's needs and continually evolved during Hopkins's time at the company.

145. Finally, Hopkins argues that MWR's pit gun technology was not valuable because certain MWR employees described the pit gun program as "junk," or "shaky." (Smith Dep. 76:8–22.) Once again, Hopkins's evidence merely challenges the weight of Defendants' evidence rather than reveals an absence of evidence in support of the claim. *See RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *32 (N.C. Super. Ct. Feb. 18, 2016) (noting that section 66-152 does not provide a bright-line rule as to the value of a claimed trade secret). Norris has testified that developing a clutch gun program was valuable for MWR to stay competitive with other teams who had clutch gun programs, (Norris Dep. 148:8–9), and MWR's pit stop times improved significantly after MWR implemented its clutch gun program, (Norris Dep. 148:11–

23). Hopkins himself has acknowledged that the clutch gun program was valuable. (130:14–24.) The Court therefore concludes that MWR has advanced sufficient evidence from which a rational factfinder could reasonably conclude that its clutch gun technology qualifies as a trade secret under the Trade Secret Protection Act.

146. The Court next addresses Hopkins's argument that MWR has not offered evidence of misappropriation. The statute defines misappropriation as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent." N.C. Gen. Stat. § 66-152(1). Hopkins contends that his possession of the 035 Gun and sockets at home does not amount to "acquisition . . . without express or implied authority or consent." (Pl.'s Mem. Supp. Mot. Summ. J. 29.) A central factual dispute in this case, however, is whether bringing home the 035 Gun amounted to a condoned and unremarkable occurrence or a serious violation of company policy meriting termination. The parties do not dispute that Hopkins "acquired" the 035 Gun and sockets, but there is a genuine issue of material fact concerning whether he did so with authority or consent. Because MWR has produced sufficient evidence in support of both elements of its claim, the Court must deny Plaintiff's motion for summary judgment on Defendants' misappropriation claim concerning the 035 Gun and sockets and the Confidential Documents.

e. Unfair or Deceptive Trade Practices

147. To succeed on a claim for unfair or deceptive trade practices, a claimant must show: "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the

plaintiff or his business." *Combs*, 147 N.C. App. at 374, 555 S.E.2d at 642; *see also* N.C. Gen. Stat. § 75-1.1. A violation of the Trade Secrets Protection Act constitutes an unfair act or practice under N.C. Gen. Stat. § 75-1.1. N.C. Gen. Stat. § 66-146(b). Similarly, an act of conversion can rise to the level of unfair or deceptive conduct. *Faucette v. 6303 Carmel Rd., LLC*, 775 S.E.2d 316, 324 (N.C. Ct. App. Jul. 21, 2015). Defendants have therefore proffered sufficient evidence as to the first element of their claim although they are not relieved of the burden to prove the other elements of the claim. *See id.*; *Allegis Group, Inc. v. Zachary Piper, LLC*, 2013 NCBC LEXIS 12, at *30 (N.C. Super. Ct. Feb. 25, 2013) ("If a violation of the [Trade Secret Protection Act] otherwise is shown to be 'in or affecting commerce' and the proximate cause of injury to the [claimant], it is a violation of the [Unfair or Deceptive Trade Practices Act] as well.").

148. In this case, Defendants' claim fails on the second element. "[T]here is a presumption against unfair [or] deceptive practice claims as between employers and employees. . . . Ordinarily, in such a context, the claimant must make a showing of business–related conduct that is unlawful or deceptive acts that affect commerce beyond the employment relationship." *Gress v. Rowboat Co.*, 190 N.C. App. 773, 776, 661 S.E.2d 278, 281–82 (2008) (citation omitted). This exception arises from the rationale that internal employer-employee disputes are not sufficiently "in or affecting commerce." *Id.* Commerce under the statute means "business activities," which "connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other

activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991). Circumstances in which an employee's allegedly unfair or deceptive acts are in or affecting commerce tend to "involve 'outside businesses,' 'distinct corporate entities,' or the interruption of a 'commercial relationship' between two market participants." *Alexander v. Alexander*, 792 S.E.2d 901, 906 (N.C. Ct. App. Dec. 6, 2016).

149. Here, Defendants' counterclaims arise from conduct occurring during the employment relationship and culminate in MWR's termination of Hopkins's employment. MWR does not allege that Hopkins's actions involved the sort of conduct that *Alexander* held brings an employee's wrongful acts out of the employment relationship and into the world of commerce. Indeed, MWR has not alleged that Hopkins ever used its trade secrets or other property to MWR's disadvantage. Therefore, Defendants have failed to show that Hopkins's alleged actions were "in or affecting commerce," and Defendants' claim for unfair or deceptive trade practices must therefore be dismissed. *See Tai Sports, Inc. v. Hall*, 2012 NCBC LEXIS 64, at *56 (N.C. Super. Ct. Dec. 28, 2012) (dismissing unfair or deceptive trade practices claim where the relationship between plaintiff and defendants was "nothing more than that of employer and employee").

f. Attorney's Fees

150. Finally, Hopkins's Motion argues that he is entitled to attorney's fees as a matter of law for defending against Defendants' claims for misappropriation of trade secrets and unfair or deceptive trade practices, which Hopkins contends are frivolous

and asserted in bad faith. (Pl.'s Br. Supp. Mot. Summ. J. 33.) The Trade Secret Protection Act allows the Court discretion to award attorney's fees to the prevailing party if a misappropriation claim is made in bad faith. N.C. Gen. Stat. § 66-154(d). Because Defendants' misappropriation of trade secret claim will proceed to trial, the Court cannot conclude as a matter of law at this stage that Hopkins is entitled to attorney's fees under the Trade Secret Protection Act.

151. The Unfair or Deceptive Trade Practices Act similarly allows the Court to, in its discretion, award attorney's fees to the prevailing party upon the Court's finding that "the party instituting the action knew or should have known, the action was frivolous and malicious." N.C. Gen. Stat. § 75-16.1(2). Hopkins alleges that MWR acted frivolously and maliciously by bringing the section 75-1.1 claim in retaliation for filing this lawsuit. The Court cannot make such findings as a matter of law at this stage in light of the large number of factual issues to be determined at trial. *See Evans v. Full Circle Prods.*, 114 N.C. App. 777, 781, 443 S.E.2d 108, 110 (1994) ("Even if the requirements are met, an award of attorney's fees under N.C. Gen. Stat. § 75-16.1 is in the trial court's discretion."). Thus, Plaintiff's Motion seeking an award of attorney's fees under N.C. Gen. Stat. § 66-154(d) or § 75-16.1 at this stage of the litigation is denied.

V.

CONCLUSION

152. **WHEREFORE**, for the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment as follows:

a. The Court DENIES Defendants' Motion for Summary Judgment on Plaintiff's claims for violations of the Americans with Disabilities Act, violations of the Family and Medical Leave Act, violation of the North Carolina Retaliatory Employment Discrimination Act, and wrongful discharge in violation of public policy, and each of these claims shall go forward to trial.

b. The Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's claim for tortious interference with contract and dismisses Plaintiff's claim with prejudice.

c. The Court DENIES Defendants' Motion for Summary Judgment on Plaintiff's claim for tortious interference with prospective economic advantage, and Plaintiff's claim shall go forward to trial.

d. The Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's defamation claim and dismisses such claim with prejudice.

e. The Court DENIES Defendants' Motion for Summary Judgment on Defendants' request to limit Plaintiff's damages, without prejudice to

Defendants' right to renew their request at the motion *in limine* stage of this litigation.

f.  The Court GRANTS Plaintiff's Motion for Summary Judgment on Defendants' breach of contract counterclaim to the extent it is based on the Employee Manual, and such counterclaim is dismissed with prejudice. The Court DENIES Plaintiff's Motion for Summary Judgment on Defendants' breach of contract counterclaim to the extent it is based on the Employment Agreement, and such counterclaim shall go forward to trial.

g.  The Court GRANTS Plaintiff's Motion for Summary Judgment on Defendants' counterclaim for conversion of the 040 Gun and the 035 Gun and sockets and dismisses such claims with prejudice. The Court DENIES Plaintiff's Motion for Summary Judgment on Defendants' counterclaim for conversion of Defendants' Confidential Documents, and such counterclaim shall go forward to trial.

h.  The Court GRANTS Plaintiff's Motion for Summary Judgment on Defendants' counterclaim for trespass to chattels concerning the 040 Gun and dismisses such claim with prejudice. The Court DENIES Plaintiff's Motion for Summary Judgment on Defendants' counterclaim for trespass to chattels as to Defendants' Confidential Documents and the 035 Gun and sockets, and such counterclaim shall go forward to trial.

i. The Court GRANTS Plaintiff's Motion for Summary Judgment on Defendants' counterclaim for misappropriation of trade secrets as to the 040 Gun and dismisses such claim with prejudice. The Court DENIES Plaintiff's Motion for Summary Judgment on Defendants' counterclaim for misappropriation of trade secrets as to Defendants' Confidential Documents and the 035 Gun and sockets, and such counterclaim shall go forward to trial.

j. The Court GRANTS summary judgment on Defendants' counterclaim for unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1 and dismisses such claim with prejudice.

k. The Court DENIES summary judgment on Plaintiff's request for attorney's fees, without prejudice to Plaintiff's right to renew his request at a later stage in the litigation.

**SO ORDERED**, this the 31st day of May, 2017.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases